IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE RICCA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PRUDENTIAL INSURANCE | : | No. 08-257 |
| COMPANY OF AMERICA | : | |

## MEMORANDUM

Ludwig, J.                                                   September 30, 2010

This is an action for judicial review of an administrator's denial of disability insurance benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*; <u>see</u> § 1132(a)(1)(B).  Jurisdiction is federal question.  29 U.S.C. § 1132(e); 28 U.S.C. § 1331.

Plaintiff Michelle Ricca, a former employee of Carlson Holdings, Inc., moves for summary judgment to recover long-term disability benefits under a group disability insurance policy issued to Carlson by defendant The Prudential Insurance Company of America.  The policy is an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1).

Prudential cross-moves for summary judgment.  Both motions will be denied. Prudential's refusal of benefits was unreasonable and an abuse of its discretion as plan administrator.  Nevertheless, genuine issues of material fact remain as to plaintiff's entitlement to the benefits in question.  Accordingly, this action will be remanded for further proceedings.

Plaintiff, now 56 years old, was injured in a motor vehicle accident on April 12, 2004.

Compl. ¶ 16; Certification of Eric J. Konecke (Cert. Konecke), Ex. A. TGI Friday's, a Carlson company, employed plaintiff as its director of operations. At that time she was a participant under Group Disability Insurance Policy, Number GO-63871-MN, issued to Carlson by Prudential. Id. at ¶¶ 7, 8-9; PRU000363-431, 375-77.[1] Because of her injuries, plaintiff stopped working on April 21, 2004. Compl. ¶ 16, Cert. Konecke, Ex. A.

In November 2004, plaintiff applied to Prudential for long-term disability insurance benefits, asserting that as of April 21, 2004, she was unable to work because of neck and back pain, muscle spasms, and other injuries sustained by her in the accident. PRU000265-74. On January 17, 2005, Prudential denied her claim. PRU000349-352. On June 29, 2005, plaintiff filed an administrative appeal, and on August 24, 2005, Prudential upheld its original denial of benefits. PRU000106-09, 333-37. On February 20, 2006, plaintiff filed a second administrative appeal, and on May 8, 2006, Prudential again upheld its original denial. PRU000050-60, 314-17. On January 15, 2008, having exhausted her administrative remedies, plaintiff filed this action for judicial review. On May 26, 2010, oral argument was heard on the parties' cross-motions. According to the parties' "Joint Summary of Issues," the "sole issue is whether Prudential's determination that [plaintiff] was not disabled under the 'regular occupation' definition [of the Policy], based upon the administrative record, was arbitrary and capricious." Id. at 2.

---

[1]     The administrative record in this case is Bates-stamped using the prefix "PRU," followed by a six-digit page number. The citations to the administrative record follow that format throughout this Memorandum.

Prudential, as the Policy plan administrator, has sole responsibility for determining eligibility for benefits. Here, Prudential found that plaintiff was able to perform "the material and substantial duties of her regular occupation" and was, therefore, not disabled as defined by the Policy. See Policy, PRU000390. Prudential also decided that plaintiff had not been "continuously disabled" for 180 days, as required by the Policy's "elimination period," and therefore, she was not eligible for benefits. See id. at PRU000391. Plaintiff asserts that she satisfied the elimination period because she was continuously disabled from April 21, 2004 through October 17, 2004. Comp. ¶ 17, Cert. Konecke, Ex. A.

The medical evidence of record, as developed by Prudential's claims administration department, reflects that plaintiff was treated by two physicians and a social worker after her April 2004 accident – John E. Moskaitis, M.D., plaintiff's primary care physician who coordinated her specialists and ordered diagnostic tests, Nancy R. Shanahan, M.D., a physical medicine and rehabilitation specialist, and Lee Ann Hartwell, M.S.W., L.C.S.W.

Dr. Moskaitis treated plaintiff from April 13, 2004 to June 4, 2005. PRU000092-97, 215-28. Although Dr. Moskaitis's records may be difficult to read in places, they clearly disclose the following findings and conclusions. On April 13, 2004, the day after plaintiff's accident, x-rays of her right knee, cervical spine, and right wrist and shoulder revealed "moderate [cervical] degenerative changes with prominent osteophyte formation at C5-6 and some minimal impingement intervertebral foramina bilaterally." PRU000232. That same day, Dr. Moskaitis found that plaintiff had severe neck and lower back pain, muscle spasms,

and a reduced range of motion. PRU000269. He concluded that she could not perform heavy lifting or sit for long periods of time. Id. His diagnosis was that she had renal contusions and trapezius myositis. PRU000228. On May 10, 2004, at Dr. Moskaitis's request Dr. Shanahan performed both an EMG and a nerve conduction velocity study on plaintiff. PRU000255-57. On October 11, 2004, Dr. Moskaitis stated in a prescription note that plaintiff was "out of work indefinitely [and that] she has sprain & strain of the lumbar sacral spine & cervical spine and renal contusions." PRU000216. On January 4, 2005, Dr. Moskaitis recorded that she had low back pain. PRU000217.

At times, he prescribed pain medications, including Vioxx and Percocet. PRU000070, 74. On February 16, 2005, his conclusions were: plaintiff was limited to one hour of sitting, standing, and walking in an eight-hour day, with adjustments to her position every fifteen minutes; she could lift five pounds frequently and ten pounds occasionally; and she could carry five pounds occasionally but at no times ten pounds – and she could not use her right hand to grasp, push and pull, or do fine manipulation and could not use her right foot repetitively to operate controls. PRU000093-94.

On June 6, 2005, Dr. Moskaitis reported that plaintiff continued to receive treatment for her neck and back pain, and surgery on both wrists was being scheduled for carpal tunnel syndrome. PRU000097. He believed an MRI performed on May 16, 2005, "show[ed] a progression of the degeneration of the cervical spine." Id. On June 22, 2005, Dr. Moskaitis filled out a medical form, stating that, based on objective medical findings, plaintiff suffered

from severe pain that interfered with her ability to concentrate on job tasks, sleep, perform daily activities, and maintain relationships with others. PRU000092. In his opinion, these findings demonstrated that plaintiff could not return to work. PRU000097.

On May 10, 2004, during a visit to Dr. Shanahan, plaintiff complained that since her accident, "her entire right side fe[lt] heavy" and she had "an echo in her right ear." PRU000255-57. Dr. Shanahan believed plaintiff's nerve conduction velocities and distal latencies were within normal limits. Id. She noted a borderline abnormal difference between the right radial and medial distal latency, which showed a "very minimal amount of sensory carpal tunnel syndrome." Id. She further noted C5-C6 radiculopathy on plaintiff's right side. Dr. Shanahan recommended physical therapy for plaintiff's complaint of a decreased range of motion in her neck. Id.

Plaintiff participated in physical therapy with NovaCare Rehabilitation from May 25, 2004 until she was discharged on August 3, 2004. PRU000179-97, 214, 229-30. Plaintiff's condition, as noted on discharge, was that her lumbar spine was better but her neck pain persisted, although it had reached a "plateau"; her sleep continued to be disturbed by pain. PRU000179, 214.

Plaintiff also had visits with Ms. Hartwell, from October 18, 2004 to December 8, 2004. PRU00237-49. Hartwell's notes reflect plaintiff's frequent complaints of chronic pain that interfered with her ability to drive, sleep, and sit comfortably for even brief periods of time. PRU000237-39.

According to a report dated May 13, 2005, by James J. Gaul, M.D., a neurologist whom plaintiff consulted, his review of the April 21, 2004 MRI of her cervical spine showed "degenerative changes particularly at C5-6, C6-7, and to a lesser degree C4-5," with "a foraminal stenosis maximal at C5-6, to a lessor degree C6-7." PRU000098, 97-99. His report also stated that "[t]he EMG needle study shows evidence of denervation in an approximate C5, C6 root distribution on the right, with evidence of similar denervation at the abductor pollicis brevis bilaterally." PRU000099. Plaintiff continued to complain of "ongoing . . . neck pain, with pain radiating into the right shoulder and trapezius and scapular regions" and "pain and numbness radiating into the right arm, with numbness and hypersensitivity in the forearm (dorsal) and hand." PRU000098.[2]

Dr. Gaul concluded: "[t]he clinical and electrodiagnostic picture is consistent with a complex process. She has evidence of cervical radiculopathy at the approximate C5, C6 root level on the right. She also has evidence of median nerve dysfunction at the wrists bilaterally, carpal tunnel syndrome. These are due to trauma sustained in a motor vehicular accident 4/12/04." PRU000099.

In May 2005, Young Kim, M.D., a pain management specialist, also evaluated plaintiff and diagnosed her as having cervical radiculopathy and carpal tunnel syndrome.

---

[2]    In particular, Dr. Gaul found "the sensory examination reveals diminished pin sensitivity in the 2-4 digits of the right hand. There is also pin and touch hypersensitivity over the dorsal lateral forearm on the right side. She has a Tinel's sign over the right wrist. Neck mobility is markedly limited in all directions, with tenderness and spasm in the paraspinous cervical and trapezius musculature right greater than the left." PRU000098.

PRU000102-04, 71, 73.  She was given an epidural injection and selective nerve root blocks. PRU000336.

On January 17, 2005, Prudential initially denied plaintiff's benefits application based on a review of her medical records from Dr. Moskaitis and Dr. Shanahan, notes from Ms. Hartwell, and physical therapy records from NovaCare.  Prudential's staff – a physical therapist, Paula Arbadji, and a registered nurse, Nora Bargfede, R.N. – also reviewed plaintiff's records. Prudential's physical therapist concluded, based on her document review, that plaintiff should have been able to return to work after August 2004, upon completion of her therapy with NovaCare.  PRU000282-83.  Prudential's registered nurse, who reviewed only Ms. Hartwell's psychological records, found no evidence that plaintiff had a functional impairment from depression, anxiety, or cognitive deficit.  PRU000284.  Prudential's vocational rehabilitation department also evaluated plaintiff's capacity to perform her regular occupation.  PRU000280.  Based entirely on this internal review, Prudential determined that she had an acute cervical and lumbar sprain/strain, from which she could have been expected to return to work within a few weeks after the accident.  It concluded that her injuries did not have a significant impact on her ability to work throughout the 180-day elimination period. PRU000349-52, 351.

On January 29, 2005, plaintiff appealed Prudential's initial declination, submitting additional information from Dr. Moskaitis, Dr. Gaul, and Christopher M. Aland, M.D., who had  treated her carpal tunnel condition.  PRU00106-09, 87-105.  Under the Policy,

Prudential had the right to require plaintiff to be examined by doctors, other medical practitioners, or vocational experts of its choice. PRU000349. Prudential, however, did not do so. After plaintiff's first appeal, Prudential obtained another file review of her medical records (a "paper review") by an "external physician specializing in physiatry,"[3] William S. Gonte, M.D., who had not examined plaintiff. PRU00070-75, 335.

On August 12, 2005, Dr. Gonte reported that plaintiff, based on his paper review, had sustained minor injuries from the accident. PRU000074. His opinion was that the April 13, 2004 x-rays of plaintiff's spine "showed osteophyte formation at C5-C6, minimal impingement of intervertebral foramina bilaterally, [and] some minimal, nonspecific arthritic changes." PRU000072. He believed the April 21, 2004 MRI of plaintiff's cervical spine and an EMG of her upper extremities disclosed "evidence of cervical radiculopathy at C4 through C7, median nerve dysfunction at the wrist bilaterally." PRU000071. Also, a May 16, 2005 MRI of plaintiff's cervical spine disclosed "progression of the degeneration of the cervical spine." PRU000071, 73, 100-01.

Dr. Gonte concluded from plaintiff's MRI films that she had pre-existing, degenerative cervical changes, without any acute pathology, "that are certainly not the result of the motor vehicle accident and do not appear to be in reality accelerated by the motor vehicle accident." PRU000074. He found that plaintiff's carpal tunnel syndrome "appeared

---

[3]     Merriam-Webster's Collegiate Dictionary (11 ed. 2004) defines "physiatrist" as "a physician who specializes in physical medicine and rehabilitation," and defines "physical medicine" as "a branch of medicine concerned with the diagnosis and treatment of disease and disability by physical means (as radiation, heat, and electricity)." Id. at 935.

to be mild," "certainly did not seem to be of any major clinical significance," and was "unlikely to have been caused by the . . . accident." PRU000074. Plaintiff, he believed, should have been able to return to work after one to no longer than six weeks after the accident. PRU000074-75. While Dr. Gonte was aware of numerous reports of plaintiff's subjective complaints of chronic severe pain, his belief was "[t]here is no supporting data to suggest that the claimant is functionally impaired." PRU000075.

On August 24, 2005, Prudential upheld its original benefit determination, again denying plaintiff benefits. PRU000333-37. Based on its paper review, Prudential determined that "there was no mention of any psychomotor retardation, suicidal or homicidal ideation[] and there were no cognitive impairments noted." PRU000335. Prudential further decided that "[t]here is no supporting data to suggest that there is a sickness or injury" that would functionally impair plaintiff from performing the duties of her regular light-duty occupation as the result of the accident or a psychiatric condition throughout the 180-day elimination period. PRU000336.

On February 20, 2006, plaintiff filed a second administrative appeal and submitted with it a September 9, 2005 SSA decision that initially denied her claim for social security disability benefits – but then the SSA reversed itself.[4] PRU000050-60. At Prudential's request, Dr. Gonte reviewed plaintiff's second appeal; his opinions remained unchanged.

_____

[4]    At oral argument, counsel advised that the SSA eventually allowed plaintiff's claim for total disability and that she now receives $1,600.00 in social security disability payments each month. See Tr. at 3-4, May 26, 2010, Doc. No. 39.

PRU000030-31. Also at Prudential's request, an outside psychiatrist and neurologist, Stuart

Shipko, M.D., reviewed plaintiff's second appeal and medical records. He did not examine

her. In his report of April 28, 2006, Dr. Shipko stated that there was no evidence of any

psychiatric or cognitive dysfunction. PRU000004-8. On May 9, 2006, Prudential once again

upheld its original benefit determination and declined to pay benefits. PRU000314-17. In

doing so, Prudential reiterated that there was no "medical documentation" and "there was no

supporting data to suggest that there was a sickness or injury that would functionally impair

[plaintiff] from performing the material and substantial duties of her regular occupation,"

throughout the 180-day elimination period. PRU000316-17.

It is undisputed that inasmuch as the plan gives Prudential, as the administrator, sole

discretion to make eligibility determinations, the applicable standard for review is the

deferential arbitrary and capricious standard required by Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 115 (1989). Here, Prudential was also the insurance carrier for the

Policy. This dual role created a conflict of interest and must be considered a decisional factor

under Firestone[5] and Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 2346

(2008)[6]; accord Doroshow v. Hartford Line & Accident Ins. Co., 574 F.3d 230, 233-34 (3d

---

[5] In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Court held that
"if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict
of interest, that conflict must be weighed as a factor in determining whether there is an abuse of
discretion." Id. at 115.

[6] In Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008), in which
MetLife both funded the plan and had discretionary authority to determine the validity of an
employee's benefits claim, thereby involving the same type of conflict as this case, the Court came

Cir. 2009), cert. denied, 130 S. Ct. 1060 (U.S. 2010) (considering a conflict of interest as one factor among others where the insurer both funded the plan and was responsible for determining eligibility under the plan).

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under an arbitrary and capricious (or abuse of discretion) standard of review,[7] a court may overturn a plan administrator's decision only if it is without reason, or is unsupported by substantial evidence, or is erroneous as a matter of law. Doroshow, 574 F.3d at 234 (citing Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993). Our scope of review is narrow, and "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Id. (quoting Abnathya, 2 F.3d at 45) (internal quotation marks omitted)). In determining whether a decision is arbitrary and capricious, it must be considered whether the administrator had a reasonable basis for its decision, based on the facts known to the administrator at the time of the decision. Smathers v. Multi-Tool, Inc., 298 F.3d 191, 199-200 (3d Cir. 2002).

The administrative record in this case reflects voluminous treatment notes from Moskaitis, Shanahan, Hartwell, and Gaul, and others, detailing the onset and progression of

_____

to the identical conclusion as in Firestone.

[7]     "The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." Abnathya v. Hoffmann-La Roce, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).

plaintiff's complaint of chronic severe pain. As the parties agree, plaintiff's medical experts were the only ones who physically examined her. Prudential's initial denial of benefits was based on paper reviews by Prudential's staff – a physical therapist, a registered nurse, and vocational rehabilitation employees. When plaintiff appealed the denial of her benefits, Prudential engaged an external physiatrist, Dr. Gonte, to conduct a paper review of plaintiff's medical records. Relying on Dr. Gonte's review, Prudential reaffirmed its initial declination. When plaintiff appealed for the second time, Prudential employed an external psychiatrist and neurologist, Dr. Shipko, to conduct another paper review of plaintiff's medical records. Again, relying entirely on reviews performed by clinicians who had not examined her themselves, Prudential gave controlling weight to the conclusions that plaintiff was not disabled and denied her benefits.

Administrators of ERISA plans are not required to defer to the opinions of a participant's treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003); Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 127-31 (3d Cir. 2000) (an administrator's denial of benefits was not arbitrary and capricious where based on the conclusions of its health care workers and physicians, one of whom conducted an independent medical examination of the claimant, despite the opinion of claimant's treating physician that claimant was totally disabled). Nonetheless, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Nord, 538 U.S. at 834.

Prudential argues that its assessment of plaintiff's ability to work must be affirmed because it is substantially supported by the administrative record and is not erroneous as a matter of law. Prudential's physicians and other health care experts, however, did not discuss the reasons why probative evidence supporting plaintiff's claim was discounted or rejected. Dr. Gonte and Dr. Shipko did not explain their reasons for discrediting the evidence of her physical injuries – degenerative changes in the cervical spine, the cervical radiculopathy, and the carpal tunnel condition. They did not discuss her complaints of pain, seemingly disregarding them as not credible, and considered her physical condition not to be disabling. Moreover, Prudential left unexplained in its three declination letters, why or how the medical data failed to support an injury or sickness within the Policy's definition of disability. The disparity between the voluminous administrative record and the conclusory evaluations of plaintiff's condition by Prudential's health experts, makes it impossible to review Prudential's decision because it is unclear whether the evidence of her medical difficulties was credited in whole or in part or not at all – or instead, was simply not considered.

An administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so. This is particularly applicable where, as here, the evidence it claims to rely on favors its employer and consists of non-treating and non-examining experts and there is substantial evidence to the contrary. See, e.g., Schwarzwaelder v. Merrill Lynch & Co., Inc., 606 F. Supp. 2d 546, 559 & n.44 (W.D. Pa. 2009) (discussing a concern shared with other courts "where, as here, the administrator

denies a claim with reliance on the reports of paper-review consultants, in opposition to the treating and examining physicians' consistent and concurring opinions that the claimant is disabled"); Elms v. Prudential Ins. Co. of Am., No. 06-5127, 2008 WL 4444269, at *18-20 (E.D. Pa. Oct. 2, 2008) (rejecting  as a self-serving, selective use of physicians' reports, Prudential's almost exclusive reliance on file reviews performed by non-examining physicians as weighed against evidence from doctors who had treated or examined and had concluded the patient was impaired by significant disabilities).

Given the conflicting evidence in the record, Prudential's decision to accept the opinions and conclusions of its experts without explanation is itself arbitrary and capricious. This case must be remanded to the administrator for a thorough and careful analysis of all of the evidence, including the rationale for accepting its experts' opinions in preference to those of plaintiff's treating and examining health experts.  The evidence of plaintiff's subjective complaints of pain and physical limitations must be considered along with evidence that her complaints are groundless.

Prudential's election to forego an independent medical examination of plaintiff, given the subjective nature of her pain and limitations, should be reconsidered.   See Schwarzwaelder, 606 F. Supp. 2d at 560 (noting the "particular appropriateness and helpfulness" of an independent medical examination "where the disability claim encompasses significant inherently subjective complaints"); Klinger v. Verizon Commc'ns, Inc., No. 05-5312, 2007 WL 853833, at *3 (E.D. Pa. Mar. 14, 2007) (in a subjective disability case, an

administrator who proceeds without an independent medical examination is vulnerable to the "uncomfortable argument" that the administrator gave greater weight to the opinions of medical experts who did not physically examine the plaintiff than to those who did). In Glenn, the Supreme Court stated:

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge [its] duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan . . . ; it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claims denials . . . ; and it supplements marketplace and regulatory controls with judicial review of individual claim denials . . . .

128 S. Ct. at 2350 (citations and internal quotation marks omitted).

Plaintiff's motion for summary judgment will be granted to the extent that it opposes Prudential's benefits determination. Her motion for summary judgment granting her an award of benefits must be denied.

An appropriate order accompanies this memorandum.

BY THE COURT:

/s/ Edmund V. Ludwig
Edmund V. Ludwig, J.